NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CRIMPTEX, INC. and its Affiliates
French-Tex of Puerto Rico, Inc., Hamlet Industries, Inc. and Emtine, Inc.,
Respondent.

No. 74–1294.

United States Court of Appeals,
First Circuit.

Argued Feb. 6, 1975.

Decided May 27, 1975.

Allison W. Brown, Jr., Atty., Washington, D. C., with whom Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Assoc. Gen. Counsel, and Elliott Moore, Deputy Assoc. Gen. Counsel, Washington, D. C., were on brief, for petitioner.

Ruben T. Nigaglioni, Hato Rey, P. R., with whom Nigaglioni & Palou, Hato Rey, P. R., was on brief, San Juan, P. R., for respondents.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

The facts underlying the NLRB order for which enforcement is sought are uncontroverted. Respondent and the union[1] had been parties to several successive agreements, the last of which expired on March 5, 1973. The parties finally agreed on a new contract on March 23, the agreement was reduced to writing by the respondent on March 28, and on March 29 a copy was submitted to the union. The agreement, which contained a no-strike clause, was to "become effective on the date of its execution". Respondent's employees went out on strike on March 28, the agreement not yet having been signed, and the strike continued until May 9. On April 27, while the strike was still in progress, respondent informed the union by letter that it considered the strike to be in violation of the agreement reached on March 23, and that therefore respondent was rescinding the agreement.

Respondent and the union signed a strike settlement on May 9. This instrument provided that the "economic terms and conditions of the Collective Bargaining Agreement agreed upon by the parties the 23rd of March 1973, shall become

---

1. Union de Trabajadores de la Crimptex, Inc., Afiliada al Sindicato Puertorriqueno de Trabajadores de la Amalgamated Meat Cutters and Butchers Workmen of North America, AFL–CIO.

effective for the striking employees who may return to work from the date of their return to work". On March 28, when the strike began, there were 103 employees in the bargaining unit; 85 of these were union members and the other 18 were nonmembers because still within the first 30 days of employment. When the strike ended there were 71 replacements on the job, and 42 strikers were thereafter reinstated. By letters of May 11, June 18 and June 29 the union requested that respondent sign the still-unexecuted agreement. An unfair labor practice proceeding followed upon respondent's failure to respond to the letters or to execute the document, and an administrative law judge decided, after a hearing, that respondent had violated section 8(a)(5) and (1) by withdrawing recognition from and refusing to bargain with the union and by refusing to sign the contract. The Board affirmed the judge's decision and adopted her recommended order directing respondent to recognize and bargain with the union, sign the agreement upon request, and post appropriate notices.

 This appeal turns, for the most part, on the proper characterization of the relationship which existed after the settlement between respondent and the unreinstated strikers. Respondent asserts that it had terminated its connection to these employees by refusing them reinstatement, that they therefore were no longer within the bargaining unit, and that as a result there was a sufficient doubt as to the union's continuing majority to relieve respondent of its section 8(a)(5) bargaining obligation. This

was not a situation in which the union's majority status was shielded from challenge by Board certification within the year, but there was a rebuttable presumption that the union continued to represent a majority of the employees. NLRB v. Burns International Security, 406 U.S. 272, 279, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); Automated Business Systems v. NLRB, 497 F.2d 262, 269 (6th Cir. 1974.)[2] Respondent, if it is to be successful in disavowing the existence of a bargaining obligation, must demonstrate that it had a reasonable, good faith doubt of the union's majority. Retail, Wholesale & Dep't Store Union v. NLRB, 151 U.S.App.D.C. 209, 466 F.2d 380, 393 (1972); NLRB v. Frick Co., 423 F.2d 1327, 1330 (3d Cir. 1970).

 Here the Board found that there was no adequate foundation for doubt, and we agree. Even accepting arguendo respondent's unarticulated assumption that none of the replacements should be presumed to desire that the union represent them,[3] we reject the argument that among the strikers only the forty-two who were reinstated remained members of the bargaining unit. C. H. Guenther & Son, Inc. v. NLRB, 427 F.2d 983 (5th Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970); Food Service Co., 202 N.L.R.B. No. 107, 1973 CCH NLRB Dec. ¶ 25,202. The *Guenther* holding was squarely bottomed on sections 2(3) and 9(c)(3) of the National Labor Relations Act,[4] and respondent does not here dispute that permanently replaced economic strikers are properly included in a bargaining unit when the union's majority status is challenged.

---

2. The record does not establish whether the union had been certified by the Board, but that omission is of no significance. An employer who wishes to stop bargaining with a union which has been voluntarily recognized must overcome the same rebuttable presumption applied when the union is a certified one. NLRB v. Frick Co., 423 F.2d 1327 (3d Cir. 1970).

3. As a general matter, new employees are presumed to support a union in the same ratio as those they replace. King Radio Corp., 208 N.L.R.B. No. 82, 1974 CCH NLRB Dec. ¶ 26,-154; Emerson Mfg. Co., 200 N.L.R.B. No. 33, 1973 CCH NLRB Dec. ¶ 24,777 (1972).

4. "The term 'employee' . . . shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute . . . and who has not obtained any other regular and substantially equivalent employment . . . ." § 2(3), 29 U.S.C. § 152(3).

". . . Employees engaged in an economic strike who are not entitled to reinstatement shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this Act in any election conducted within twelve months after the commencement of the strike." § 9(c)(3), 29 U.S.C. § 159(c)(3).

*See* 427 F.2d at 986. The workers in question here were nonetheless outside the unit, respondent urges, because they had been refused reinstatement after participating in an unlawful strike.

■ Deferring for a moment the question of whether the strike was an unlawful one, it is worthwhile to note that the inclusion of replaced strikers in a unit is but one aspect of their continuing relationship with the employer. Once an economic strike is over, strikers who unconditionally request reinstatement are entitled to it unless the employer has "legitimate and substantial business justifications", NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), for denying the request. NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); NLRB v. Transport Co. of Texas, 438 F.2d 258, 263–64 (5th Cir. 1971); NLRA § 8(a)(1), (3). The strikers do run the risk that they may be permanently replaced while the strike is underway, and the fact that such replacements are on the job provides an adequate justification for an employer's refusal of reinstatement. NLRB v. Fleetwood Trailer Co., *supra* ; NLRB v. Transport Co. of Texas, *supra;* see NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). The matter does not end there, however. *Fleetwood* established that strikers must be rehired, in preference to other applicants, when the jobs are reactivated, notwithstanding the fact that when they apply for reinstatement no jobs are available due to curtailment of production. The right of strikers to be on a preferential hiring list has more recently been expanded to require that, when the departure of permanent replacements creates vacancies, strikers be hired before others are. Laidlaw Corp. v. NLRB, 414 F.2d 99 (7th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970); American Machinery Corp. v. NLRB, 424 F.2d 1321 (5th Cir. 1970).

■ Respondent is correct in arguing that in this case the strikers were not necessarily entitled to the benefit of the doctrines discussed above, since the strike in which they engaged was an "unprotected" one.[5] The Board concedes that the strikers were therefore subject to discharge, and respondent, for its part, accepts the principle that discharge does not automatically follow upon the performance of unprotected activity. An "employer must affirmatively exercise his option to terminate the relationship, either by discharging the strikers or refusing reinstatement". NLRB v. Wallick, 198 F.2d 477, 484 (3d Cir. 1952). The strike settlement agreement between respondent and the union does not, in our view, evidence an intent to sever the employer-employee relationship:

> "The Union represents the Company's employees who have been on strike since the 28th of March 1973.

> "The Company and the Union have a common interest in putting an end to the prevailing strike situation . . . . .

> "Any employee who is not reinstated to his job by the Company shall receive from the Company a letter explaining the reasons on the basis of which the Company is not reinstating him to his job and if the employee and the Union are not satisfied, the latter shall request arbitration on the merits of the Company's justification for not reinstating the employee. . . . "

■ It is true that the agreement is not entirely unambiguous. The document provides, for example, that there "shall be no reprisals against any employee who returns to work with the Company", leaving open the possibility that others would as a reprisal be denied the right to return to work. The record is barren, however, of any indication that the unreinstated strikers were refused work as a result of their participation in the strike. There is nothing to

---

**5.** The Board assumed, without deciding, that the strike was unprotected because it was for the purpose of obtaining removal of a supervisor. Under most circumstances, such a strike is not protected. Dobbs Houses, Inc. v. NLRB, 325 F.2d 531, 537 (5th Cir. 1963).

show that those strikers granted reinstatement were considered by the respondent to be in any way less blameworthy with regard to the strike than those to whom reemployment was refused. It is also significant that the fact that the reinstatement was only partial is easily explained without reference to a possible punitive motive by the employer. The 42 returning strikers brought the work force to 113, while there had been 103 employees before the strike. Even if the strikers were fully within *Fleetwood* and *Laidlaw* the employer would have been required, at the time of settlement, to take no greater steps than it did to accept the strikers back. A last factor of which we take note is the fact that under the strike settlement agreement the respondent commits itself to give any striker not reinstated an explanation for the decision. Since it was clear that all the employees covered by the settlement had participated in the strike, the range of justification for nonreinstatement contemplated by the agreement could not have been so broad as to include simple participation. Since there is nothing in the record to indicate that respondent was refusing reinstatement on the basis of participation in an unprotected strike, *see* Colonial Press, Inc., 207 N.L.R.B. No. 114, 1974 CCH NLRB Dec. ¶ 25,983 (1973), all the strikers remained employees within the protection of the Act until they accepted equivalent employment. The Board thus properly considered them to be members of the bargaining unit, and respondent's doubt as to the union's continuing majority is left without the support of "facts which provide some guarantee of objectivity." Retail, Wholesale & Dep't Store Union v. NLRB, *supra,* 466 F.2d at 393.

Respondent's other arguments fall quickly. Although the strike was unprotected because of the end at which it was directed,[6] it is clear that this is not alone enough to make it unlawful or illegal. NLRB v. Wallick, *supra,* 198 F.2d at 485. The employer does, however, advance two other theories upon which it is urged that we find that the union has engaged in illegal activity. The first claim, that the strike violated the agreement's no-strike clause, is frivolous, since the March 23 agreement was by its terms to "become effective on the date of its execution" and had not been executed when the strike began. Respondent also claims that the union violated section 8(b)(3) by refusing, when requested to do so during the strike, to execute the agreement. We are urged to disqualify the union from seeking relief under the National Labor Relations Act because of the alleged misconduct, but it would be inappropriate for us to consider the merits of this issue. On April 2, while the strike was in progress, respondent filed an unfair labor practice charge against the union, alleging a violation of section 8(b)(3). This charge was withdrawn before it was acted on, and no other charges or proceedings were initiated by respondent with regard to alleged union violations. When an employer has refrained from presenting to the Board allegations of union misconduct, we will not entertain the suggestion that there has been conduct which prevents us from enforcing a Board order growing out of ULP charges which were presented for adjudication by the union.

For the reasons set out above, we agree with the Board that respondent violated section 8(a)(5) and (1) by withdrawing recognition from the union and refusing to bargain. One aspect of the Board's remedial order requires that respondent execute upon request the March 23 agreement. It is not disputed that the contract prepared by respondent on March 28 accurately reflects the agreement reached by the parties, and under section 8(d) of the National Labor Relations Act the bargaining obligation includes "the execution of a written contract incorporating any agreement reached if requested by either party." In seeking to avoid the conclusion that its failure to execute the contract is therefore in itself an unfair labor practice, H. J. Heinz Co. v. NLRB, 311 U.S.

6. See note 5 *supra.*

514, 61 S.Ct. 320, 85 L.Ed. 309 (1941); NLRB v. Ogle Protection Service, Inc., 375 F.2d 497 (6th Cir.), cert. denied, 389 U.S. 843, 88 S.Ct. 84, 19 L.Ed.2d 108 (1967), respondent contends that the union by its conduct repudiated the agreement. The conduct referred to is, however, only that which we have discussed above—the alleged breach of a no-strike obligation and the failure of the union to execute the agreement during the strike—and our conclusion must be the same. Respondent's refusal to sign the agreement was an unfair labor practice, and the Board-ordered remedy is an appropriate one.

Enforcement granted.