**PACIFIC HIDE & FUR DEPOT, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 76-2074.

United States Court of Appeals, Ninth Circuit.

May 4, 1977.

Stephen R. Frank, Tooze, Kerr, Peterson, Marshall & Shenker, Portland, Ore., argued, for petitioner.

Elliott Moore, Paul J. Spielberg, Deputy Asst. Gen. Counsel, N. L. R. B., Washington, D. C., argued, for respondent.

Before KOELSCH, DUNIWAY and GOODWIN, Circuit Judges.

DUNIWAY, Circuit Judge:

Pacific Hide & Fur Depot, Inc. (Pacific) petitions for review of and to set aside an order of the National Labor Relations Board. The Board concluded that Pacific had violated § 8(a)(1) and (5) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(a)(1) and (5) (1970), by refusing to recognize and bargain with the Amalgamated Meat Cutters and Butcher Workmen,

Local No. 656 (Union). The Board cross-petitions for enforcement of its order, which is reported at 223 N.L.R.B. No. 149. We grant the petition to review and set aside, and we deny enforcement.

## FACTS

Pacific, the Union, and Counsel for the General Counsel to the Board entered into a written stipulation of facts, and Counsel for the General Counsel rested his case before the Administrative Law Judge on that stipulation. The stipulation reserved to each party the right to amplify, supplement, or clarify any of the factual matters stipulated to, and Pacific presented the testimony of its vice president and manager of its Portland office, Mr. Thiebes. No other witness testified. This is what the stipulation and Thiebes' testimony show:

Before March, 1975, Cahen Trading Company (Cahen) had operated a hide-curing facility in Portland, Oregon, for many years. Cahen purchased hides from meat packers, processed them, and then sold them on the open market. The complement of workers employed by Cahen in the relevant unit fluctuated between twelve and eighteen, and for approximately twenty years Cahen had recognized the Union as the bargaining representative of these employees, entering into a series of collective bargaining agreements with the Union. The most recent agreement was effective from August 1, 1974, until August 1, 1977. It provided for a union shop, but contained no provision making it binding upon Cahen's successors or assigns and no reference to the possibility that Cahen might go out of business or sell its assets.

In March, 1975, a corporation related to Pacific purchased Cahen's real property and leased it to Pacific, and Pacific purchased the physical personal property of Cahen that was used in the plant. Pacific did not buy any of Cahen's intangibles, and it did not assume any of Cahen's liabilities.

On April 10, Cahen terminated all its employees, including the eighteen who were then covered by the agreement between

Cahen and the Union. On the evening of that same day, Pacific's Mr. Thiebes interviewed the Cahen workers and hired six of the eighteen unit employees, plus another such employee who had been temporarily laid off. On April 11, Pacific started operations with that crew of seven. It hired four additional employees to work in the unit, one each on April 11, 16, 17, and 18, none of whom had been Cahen employees. Thus, on April 18 it had eleven employees in the unit, seven of whom had worked for Cahen and four of whom had not. On April 17, the Union demanded that Pacific recognize the Union and comply with the collective bargaining agreement. On April 29, Pacific refused to recognize the Union, stating that Pacific was not a successor employer to Cahen.

After April 29, Pacific hired eight more employees, one on May 5, one on May 22, three on May 30, one on June 2, and two on June 6. None of these was a former Cahen employee. On June 6, Pacific had nineteen employees in the unit, seven of whom were former Cahen unit employees under the most recent collective bargaining contract, and twelve of whom were not. As the stipulation recites: Pacific "reached its full employee complement of 19 unit employees on June 6, 1975." There is no evidence, and no suggestion by the parties, that Pacific's hiring of persons who had not been Cahen employees was motivated by anti-union bias or was in any way discriminatory against the Union.

### Was Pacific Required to Bargain with the Union?

The question presented is whether, for the purposes of a duty to bargain with the Union, Pacific is a "successor" to Cahen. One of the tests of successorship is met in this case. Pacific, so far as the work of employees in the unit is concerned, has continued to conduct essentially the same business as Cahen, processing hides in the same manner, in the same plant, using the same equipment, and applying the same skills. This conclusion is not weakened by the fact that Cahen had bought most of the hides that it processed, while Pacific received them as bailee. Nor is it weakened by Pacific's intention to make some improvements in the way in which it processes hides.

■ Nevertheless, at least in a case like this one, the type of successorship that we have described is not, standing alone, enough to support a Board order requiring the "successor" employer to bargain with the Union. This is because, as the Supreme Court has made clear in recent cases, a purchaser of assets, like Pacific, which has not agreed to be bound by its vendor's contracts or to employ its workers or to bargain with their union, need not hire those workers. *Howard Johnson Co. v. Hotel and Restaurant Employees and Bartenders Int'l Union,* 1974, 417 U.S. 249, 261–62, 94 S.Ct. 2236, 41 L.Ed.2d 46; *Golden State Bottling Co. v. NLRB,* 1973, 414 U.S. 168, 184, n. 6, 94 S.Ct. 414, 38 L.Ed.2d 388; *NLRB v. Burns International Security Services, Inc.,* 1972, 406 U.S. 272, 280–81, n. 5, 92 S.Ct. 1571, 32 L.Ed.2d 61.

■ The decisions require that, in such a case, and absent a refusal to hire because of anti-union animus, a majority of the work force of the purchasing employer in the unit be former employees of the seller in that unit. If that is the case, there is a duty to bargain, it being assumed that the holdover majority continues to desire representation by the union. *Burns, supra,* 406 U.S. at 281, 92 S.Ct. 1571, and cases cited; *NLRB v. Band-Age, Inc.,* 1 Cir., 1976, 534 F.2d 1, 3; *NLRB v. Daneker Clock Co., Inc.,* 4 Cir., 1975, 516 F.2d 315, 316; *NLRB v. Zayre Corp.,* 5 Cir., 1970, 424 F.2d 1159, 1161, 1163; *Tom-A-Hawk Transit, Inc. v. NLRB,* 7 Cir., 1969, 419 F.2d 1025, 1027. On the other hand, when the successor employer has never employed in the unit a majority of its workers who are former employees of the predecessor, there is no duty to bargain. *Howard Johnson Co., supra,* 417 U.S. at 261–62, 94 S.Ct. 2236; *NLRB v. John Stepp's Friendly Ford, Inc.,* 9

Cir., 1964, 338 F.2d 833, 836; *NLRB v. United Industrial Workers of Seafarers Int. U.,* 5 Cir., 1970, 422 F.2d 59, 62–63.[1]

Under our decision in *Friendly Ford, supra,* if we take as the controlling date April 11 when Pacific began to operate in the former Cahen plant, it could be said that Pacific had "taken over and succeeded to [its] predecessor's employees." (338 F.2d at 836) On that day, there were seven employees in the unit, everyone of whom had worked for Cahen and been represented by the Union. The same is true of April 17, when the Union demanded recognition. On that day there were 10 employees in the unit, seven of whom had worked for Cahen and been represented by the Union when Cahen closed its business. Similarly, on April 29, when Pacific declined to bargain with the Union, there were eleven employees in the unit, including the same seven former Cahen employees.

■ On the other hand, on June 6, when Pacific reached its "full complement of 19 unit employees" as stipulated, there were still only seven holdovers and a majority, twelve, were not holdovers. Indeed, on May 30, there were sixteen employees, and a majority, nine, were not holdovers. No case has been cited to us in which there was such a transition from a majority to a minority of holdovers. In the cases where the holdovers were a majority, the majority existed from the beginning and continued thereafter. In the cases where there was a minority of holdovers, that was the fact from the beginning, and did not change.

Pacific bases its argument on the Supreme Court's statement in *Burns, supra,* 406 U.S. at 294–95, 92 S.Ct. at 1585:

Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is per-

fectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms. In other situations, however, it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit as required by § 9(a) of the Act, 29 U.S.C. § 159(a).

Pacific says that this case falls squarely within the last sentence. It bases that argument on the stipulation quoted above. The effect of its argument is that the Board and the Union have stipulated their case away. This may be so, but we do not think that it follows merely because the language of the stipulation tracks the language of the *Burns* "full complement" sentence. The more relevant inquiry is whether the principles underlying the *Burns* "full complement" language have been properly applied in this case.[2]

■ The *Burns* sentence implies that when a new employer hires only part of the old unit, together with others who were never part of the unit, any decision regarding the employer's duty to bargain with the union affects the new employer, the old employees whom he has hired, and the new employees who were not previously represented by the union. The rights of all three must be considered. Basic to this consideration is § 9(a) of the Act, 29 U.S.C. § 159(a), which places in the hands of the majority of the employees in the unit the decision whether to be represented or not by the union. That majority's right is paramount. The "full complement" standard of *Burns* attempts to define *when* the makeup of the controlling majority is to be determined.

1. As to refusal to hire because of anti-union animus, which is not here involved, *see K. B. & J. Young's Super Markets, Inc. v. NLRB,* 9 Cir., 1967, 377 F.2d 463, 465.

2. We realize that the "full complement" sentence in *Burns* is dictum because a substantial majority of Burns' employees in the unit were holdovers from the beginning, but that does not justify our disregarding what appears to be a carefully formulated standard.

The problem then becomes one of defining what is meant by a "full complement." That cannot be done by the application of a mathematical formula but only by considering the facts of each case in light of the general goal which is sought—to assure majority rule within the new employer's unit as to whether and if so with what union there must be collective bargaining.

The Administrative Law Judge, whose decision was affirmed by the Board, did not analyze these principles adequately. His rationale is as follows:

> The issue is whether by authority of *N.L. R.B. v. Burns International Security Services, Inc.,* 406 U.S. 272, [92 S.Ct. 1571, 32 L.Ed.2d 61] or otherwise, the recognitional obligation imposed on a successor employer may be escaped, because the numerical complement of employees needed to perform a settled volume of business was not reached until June 6, at which point a majority of such employees had not previously worked for Cahen. This issue must be resolved against Respondent. To the extent that language in *Burns* alludes to certainty, or lack thereof, in whether a ."new" employer plans to retain unit employees, this relates to issues of whether unilateral change in terms and conditions of employment may lawfully be made. That portion of the rationale in *Burns* does not affect traditional principles governing when an employer becomes successor to an earlier employing industry and must recognize an incumbent labor organization. Respondent misperceives the meaning of "full complement" in a situation of this kind. No break in operations occurred and the nucleus of needed plant skills was created by hiring persons, *all* of whom had previously been Cahen employees. When the Union demanded recognition a preponderance of former employees was 7 out of 10 and this ratio remained essentially unchanged through the time that recognition was refused. Just as Cahen's work force had fluctuated between 12 and 18, so too Respondent employed increasingly more as flow, handling and shipment of hides progressed under revised marketing patterns. But Respondent is without power to defer a successorship consequence until some point in time when it considers, in a business management sense, that full employee complement has been reached. It is not a matter of whether a majority of former employees are among the total denominated an ultimate complement, but instead whether under "substantially unchanged" operations a work complement is composed primarily of predecessor employees at the time a perfected demand for recognition arises. . . . Here the greater number (arithmetically a "majority") of employees actually utilized during a significant period of time had been with the predecessor employer Cahen. It is this configuration that impregnates Respondent's assumption of operations with concomitant obligation to recognize the Union's settled bargaining relationship. (footnotes omitted)

The Judge distinguished *Burns*:

> In *Burns*, the court articulated this term [full complement] while dealing with the issue of whether assertedly unilateral changes warranted a "make whole" remedy. The real significance of *Burns* to a classific [*sic*] successorship case as here involved, is its treatment of certification year principles after "address[ing] first [the] alleged duty to bargain."

We are not persuaded. While it is true that the "full complement" statement appears in the part of the *Burns* opinion dealing with a claim that Burns had improperly made unilateral changes in terms of employment (part IV of the opinion, 406 U.S. at 292–96, 92 S.Ct. 1571), the sentence in question deals expressly with "duty to bargain" (*id.* at 295, 92 S.Ct. 1571), which is involved here. And the rationale is that in some situations it will not be known whether there is a duty to bargain until the employer has hired his full complement. This is because the employer is a new employer, doing his own hiring, and if a majority of the unit workers whom he hires are

not former employees of the predecessor, that majority's rights will be denied if the new employer is required to bargain with the union as their representative. To reach such a result is to defeat, not support, the majority rule requirement of § 9(a) of the Act, 29 U.S.C. § 159(a).

It is not, as the Administrative Law Judge states, a matter of whether "the recognitional obligation imposed on a successor employer may be escaped." The question is, does the obligation exist, not may it be "escaped." Here, the Administrative Law Judge and the Board have neglected the rights of the new employees, who are in the majority.

We reached a similar conclusion, prior to the Supreme Court's holding in *Burns,* when we stated in *Friendly Ford, supra,* 338 F.2d at 836:

> The controlling question here, it would seem to us, is whether the new owner may rationally be said in substance, as to the unit in question, to have taken over and succeeded to his predecessor's employees. If he has not—if, on the contrary, he has within the unit in question secured his own employees—then he is not, as to the employees in question a successor. He is their original employer. In such case both the employer and the employee unit are strangers to the certification and to the election upon which it was based. Nothing remains of the relationship to which the certification attached. Under such circumstances, in our judgment the certification cannot stand.

This, we think, fairly describes the case at bar, except that here we have an established practice of recognition and bargaining, instead of a certification.

We conclude, applying the *Friendly Ford* principles and the *Burns* "full complement" principle to the stipulated facts, that the Board erred in issuing its order to bargain.

The complement of workers employed by Pacific steadily expanded as planned, the period of time involved was short, less than sixty days, and the "full complement" was nineteen—just one more than Cahen's complement when it ceased operations. This, we think, is just the type of case that we described in *Friendly Ford* and that the Supreme Court referred to in the "full complement" sentence in the *Burns* opinion. It is no answer to point to the fact that Cahen's complement had fluctuated between ten and eighteen. Pacific, unlike Cahen, could maintain steady capacity operation and employment by bringing in hides from its twelve other plants located in other states. While Mr. Thiebes testified that, when Pacific took over, he did not know exactly how many men he would need or how long it would take to have a full work force, he also testified that he did not begin with a full work force, but had hired such a force on June 6. Production per day increased from about 800 hides on April 11 to about 1200 on June 6. With its twelve other plants, Pacific would be able to maintain a steady output at that level, and nineteen employees were needed in the unit to operate at that capacity. All this directly supports the stipulation.[3]

The petition to review the decision and order of the Board is granted, the Board's order is set aside, and the Board's petition to enforce its order is denied.

---

**3.** We do not mean to imply that the crucial date here was June 6. Rather, considering such factors as the plant's method of operation and the level of output to be maintained, the logical time for measuring the "full complement" would, in this case, regardless of the precise date, occur after a majority of the unit was no longer composed of former Cahen employees. That is sufficient for this decision.