HUMES ELECTRIC, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 82–7700, 82–7587.

United States Court of Appeals, Ninth Circuit.

Argued May 5, 1983.

Submitted June 28, 1983.

Decided Sept. 7, 1983.

Before SNEED and TANG, Circuit Judges, and COPPLE,* District Judge.

TANG, Circuit Judge.

Humes Electric, Inc. petitions for review of the Decision and Order of the National Labor Relations Board, 263 NLRB No. 159 (Sept. 20, 1982), holding James Devers' discharge illegal and ordering his reinstatement and back pay. The Board has filed a cross-application for enforcement of its order. For the reasons that follow, we deny the petition for review and order enforcement.

*Facts:*

The critical factual issue before the Board was Humes' motivation in firing Devers. The Board concluded that Devers was fired for engaging in protected activity. Humes argues that Devers was fired for poor production and insubordination.

Before Devers was fired, he had worked for four weeks as a foreman for Humes on their "Elk Hills Project" which involved setting large electrical poles and stringing wire at the Elk Hills Naval Petroleum Reserve. Though not directly communicated to Humes, Devers was the Union Steward on the job. Humes was, however, aware that Devers was a union man with a lot of influence with the other workers. Conflicting testimony was presented, and both Devers' and Humes' views of the reasons for Devers' discharge have support in the record. The Board found that Humes had "presented sufficient evidence that it had legitimate concerns about Devers' productivity on the Elk Hills project," 263 NLRB at ——, but that Devers' discharge was "grounded . . . in his participation in the joint meeting of union and management officials on the subject of crew size . . . and in his pursuit, as job steward, of larger crews." *Id.* at ——.

Stuart H. Young, Jr., Los Angeles, Cal., for petitioner.

Fred Havard, Washington, D.C., for respondent.

* Honorable William P. Copple, United States District Judge for the District of Arizona, sitting by designation.

The Board's decision turned on its resolution of the conflict over when Humes decided to terminate Devers. Humes contended that the decision to fire Devers was made on August 6, following conversations first, between Humes' management over Devers' lack of production, and second, between Devers and Ingram (Humes' foreman). According to Humes, the decision to fire Devers came after Devers expressed a lack of concern over Ingram's complaints and after Devers "stormed" out of the office when Ingram told him the work he'd been doing was easy.

According to Humes, when Ingram reported the meeting's results to Humes' Vice President Geissel, they decided to fire Devers the next day, August 7. Devers was ill August 7 and 8, however, and by Monday, August 11, Geissel had decided to wait until payday, August 12, to fire Devers. According to Humes, firing Devers on payday would accord with company policy to terminate on a payday, absent unusual circumstances.

In the meantime, Geissel on August 8 had spoken with Union Business Representative Al Fitts and they agreed to meet at the job site to straighten out some problems. The August 11 meeting was attended by Devers, Fitts, Ingram and Ron Parrent, attending in Geissel's place. At the meeting all ultimately agreed to crews of up to 10 men with one non-working foreman. It was also agreed that Devers and another working foreman would no longer be foremen. The next day, August 12, Ingram gave Devers his pay check, with a "pink slip" stating "letter to follow". The letter that followed stated that Devers was fired for non-production.

The Board found that Humes fired Devers because of his complaints about crew size and his participation in the meeting. The Board concluded that had Humes

> been resolute in its alleged August 6 decision to discharge Devers on August 7, it clearly would have implemented the discharge prior to August 12. Although Respondent had legitimate concerns with Devers' work output, we find that his

lack of productivity was blown up out of proportion by Respondent to veil the solution which Respondent desired: namely, Devers' discharge because of his participation in the August 11 meeting and his advocacy of change contrary to Respondent's economic interests.

263 NLRB at ——.

Humes argues that the Board's decision is not supported by substantial evidence, specifically arguing the following:

(1) the General Counsel failed to make out a prima facie case;

(2) Humes met its *Wright-Line* burden by establishing that Devers would have been discharged for reasons unrelated to protected activity;

(3) the Board drew impermissible conclusions from the evidence;

(4) the Board engaged in improper fact-finding; and

(5) Devers was a supervisor and thus not protected by the Act.

### 1. *Prima Facie Case*

■ There was ample evidence to support a *prima facie* case.

Devers argued for larger crews in order to insure safety. That Devers' criticisms had an objective basis is evidenced by the fact that other employees as well were concerned about crew sizes. Protests concerning unsafe conditions are protected under the Act. The combination of Devers' protests and his subsequent dismissal the day after the meeting on crew size were enough to establish a *prima facie* case.

### 2. *Wright Line Burden*

■ In the decision below, the Board acknowledged that Humes showed that its concerns about Devers' productivity were legitimate. Nevertheless the Board found that Humes fired Devers for his participation in the union-management meeting on crew size and for Devers' general pursuit of larger crews. Humes argues that this conclusion was erroneous and that it resulted

from an error in placing the burden of proof on Humes.

First, we note that once the General Counsel proved by a preponderance of the evidence that Humes' displeasure with Devers' protected activity contributed to Devers' discharge, the Board was justified in placing the burden on Humes to show that Devers would have been fired for legitimate reasons regardless of his protected activity. The Supreme Court has recently held that the Board can properly place the burden of proving this affirmative defense on the employer. *N.L.R.B. v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (holding that the test enunciated by the Board in *Wright-Line,* 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir.1981) cert. denied 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), is proper).

Humes argues, however, that the Board placed on Humes two burdens: that of proving that Devers was discharged for poor production as well as that of disproving the *prima facie* case. We disagree.

It is clear that the Board concluded that though Humes had legitimate concerns about Devers' production, it fired him because of his union activities. There is no showing that the Board required Humes to *disprove* the *prima facie* case as well.

Humes further argues that *Transportation Management* should not be applied to this case because the facts of this case are so different from the facts of *Transportation Management.* In *Transportation Management,* Humes argues, the company essentially confessed to having an improper motive, but sought to show that the employee would nevertheless have been fired for legitimate reasons. In contrast, Humes argues, Humes denied any improper motive at all; thus the burden to prove that the firing would have occurred anyway should never have been shifted to Humes.

■ We disagree with Humes' analysis. *Transportation Management* does not distinguish between those cases where the company denies wrongdoing and those cases where it does not. Rather, *Transportation Management* stands for the uncomplicated proposition that where the General Counsel has made a prima facie case (showing by a preponderance of the evidence that the discharge was motivated by a desire to frustrate protected activity), the burden shifts to the company to show by a preponderance of the evidence that the discharge would have occurred for legitimate reasons anyway. The company's denial of wrongdoing, while relevant, does not bear on the shifting of the burden.

■ Humes next argues that even if the burden was properly placed on Humes, Humes sustained its burden of showing that Devers was discharged for poor production and insubordination. We disagree. Taking the record as a whole, the Board's decision is supported by substantial evidence. The factual circumstances surrounding Devers' discharge, particularly the timing of the discharge, Humes' failure to give a reason at the time of the discharge and the fact that Humes' owner, Reed, threatened to fire Geissel if Devers were reinstated provide strong support for the Board's decision.

### 3. Conclusions from the Evidence

Humes argues that the Board discredited five witnesses whose uncontradicted testimony was that the date of the decision to fire Devers was on or about August 6, and not August 11. Humes argues that the Board inferred that the opposite was true, and that this was error as a matter of law. Humes argues that the Board "created an essential fact"—that the decision occurred after the August 11 meeting. We disagree. Disregarding the discredited testimony, ample circumstantial evidence points to a decision made only after the August 11 meeting: no warning was given despite the opportunity; a final paycheck was not drawn before August 12; no mention was made to Devers of the final decision despite an ample opportunity; and no reason for the firing was given at the time of the final paycheck despite normal company practice to give a reason at the time of discharge.

The Board did not "create an essential fact."

### 4. *Improper Factfinding*

Humes argues that in several instances the Board improperly credited a witness's testimony on one subject, and then for no apparent reason discredited the same witness's account of another conversation or event.

We do not agree with Humes' characterization. Many of the examples cited by Humes do not involve a crediting and subsequent discrediting of the same person's testimony. Rather, the examples present questions of which inference should be drawn from testimony that, even if believed, is open to differing interpretations.

The one example Humes offers that does reflect a crediting and later discrediting of the same witness involves the testimony of Haskell Ingram. Humes argues that the Board credited Ingram's testimony as to the nature of the terrain, yet without explanation discredited the same witness's testimony on the reasons for Devers' firing. It is true that the Board did not explain why it credited Ingram's testimony as to the terrain, but the ALJ's decision contained ample justification for discrediting Ingram's version of Devers' firing. It is clear that the Board approved and adopted the ALJ's finding on this point.

### 5. *Devers' Status*

■ Humes argues that Devers was a supervisor and therefore not protected by the Act. Humes supports this by pointing to Devers' status as foreman, earning 10% more than journeymen, and to a provision in the collective bargaining agreement that specified that workers are to take directions only from the proper foreman.

The Board's finding that Devers was not a supervisor is supported by substantial evidence. Devers only learned that he was a foreman when he received his first paycheck. This hardly supports the view that he was a supervisor. Moreover, Ingram, the general foreman, directed the work of both crews. There is no showing that Devers had been empowered to exercise his independent judgment.

The petition for review is DENIED. The Board's order shall be ENFORCED.

SNEED, Circuit Judge, concurring:

I concur in Judge Tang's opinion. I write only to call attention to an interaction between the employer's *Wright Line* burden and the substantial evidence standard to which we must adhere in reviewing the Board's findings. An employer, who presents a fairly strong case that an employee was discharged for reasons unrelated to protected activity, but which case fails to convince the Board that the showing amounts to a preponderance of the evidence, should not be sanguine about the Board's result being overturned by a court. Inevitably, or almost inevitably, the evidence that established the employee's prima facie case, plus a bit more, probably will constitute substantial evidence. The employer's proof that will require a court to overturn a Board's finding against it very likely must be stronger than the preponderance of the evidence burden that *Wright Line* imposes. To say either that we must affirm a Board's finding against the employer when that finding rests on nothing but the employee's prima facie case, or that we can reverse such a Board's finding only if the employer's proof is beyond a reasonable doubt, is to go too far. However, it is also clear that we are not entitled to reverse a Board's finding merely because in our view the employer did show by a preponderance that the discharge was for reasons unrelated to protected activity.

In sum, we must abide by the Board's result if it is supported by substantial evidence even though we are convinced it improperly applied *Wright Line*. *See N.L.R.B. v. Nevis Industries, Inc.,* 647 F.2d 905, 908 (9th Cir.1981). This places the Board in a very responsible position in cases involving the *Wright Line* burden. It must apply *Wright Line* scrupulously. Not to do so ordinarily will increase the weight of the

employer's burden and substantially immunize this increase from appellate review.